The next matter, number 25-1941, Novartis Pharmaceuticals Corporation v. Peter F. Neronha, et al. At this time, would counsel for the appellant please come to the podium and introduce herself on the record to begin? Good morning, Your Honors, and may it please the Court, Jessica Ellsworth on behalf of Novartis, and I'd like to reserve two minutes for rebuttal. You may. Your Honor, I'm going to spend most of my time this morning talking with you about preemption. But before I do that, I want to just do two things that I think are important for framing the preemption discussion. And that is to talk about the three things that the challenged provisions do in this Rhode Island statute. The first is that the Rhode Island statute changes the price tag on certain units of drugs from the otherwise applicable commercial price to the 340B federal discounted price. That is the first impact of these challenged regulations. The second is that they prohibit manufacturers from requiring basic claims data, like who the patient is, what provider wrote the prescription. This is very basic data that manufacturers can and do use in evaluating whether they should request an audit and whether there's some indicator of impropriety or duplicate discounting or something else going on. And then the third thing these challenged provisions do is create separate state law enforcement mechanisms for a federal program that will answer federal questions. What this statute does not do is equally important to our conversation this morning. It does not regulate pharmacies. It does not change the volume of any manufacturer's drugs that are sold in the state of Maine. It doesn't impact where a patient can go to get a drug. It doesn't impact the price that a patient pays. It doesn't cover all manufacturers, all pharmacies, all hospitals, all drug deliveries. And it doesn't regulate consumer health and safety, like a regulation about a dangerous drug or pharmacist licensing. So Judge Reichelman, that brings us to preemption, and I want to start with your question about whether there's a gap and what that means. Can I ask you? I was trying to hold my preemption question. So here's what I'm struggling with, and you can tell me why I'm sure you're going to disagree with what I'm about to describe to you. So looking at the concept of field preemption, it seems like there aren't actually a lot of rules that we can rely on to decide how to define the field. The level of generality that we use in defining the field is very determinative in a lot of ways of the rest of the analysis. And from what I can tell from the cases, really, we're supposed to look at context. That's really the thread that I see, is that context really determines how the field is defined. So here's my question for you. I look at the context, so I look at the text of the statute, the statutory history, the context, which I'm supposed to do under Supreme Court case law. And this is how I understand what happened here, just as a matter of fact. Congress creates the Medicaid drug rebate program. The manufacturers sign up, but then they start to charge the covered entities for some of the money that they're giving to the federal government through the drug rebate program. And Congress says, no, you can't do that. You can't try to make up the money with the covered entities who really need it. And so one way of looking at what the field is here and what Congress said is relatively narrow. So Congress says, we're going to fix this problem, this unintended consequence, I think it's been called. We're going to say you have to charge, give the upfront discount to covered entities. And then the other part of the bargain we've created for you manufacturers is we're going to put in provisions so that there isn't abuse. There's no diversion. There's no double discounting. And that's what we've done. That's our field. And for whatever reason, we haven't really addressed all these other issues, even though there are background facts about contract pharmacies. And so therefore, it looks like there's silence or a gap or not a real policy choice, not as the way that you framed it in your brief. So why am I wrong? Can you actually point to concrete facts data that I can look at to say that that's a wrong way to look at what's happened and what the field is? I think I can, Your Honor. I want to just start with your concept, because I heard you say it in Abby's argument as well, that somehow the reason for this 340B program was manufacturers trying to claim back money that they were losing through the Medicaid drug rebate program. And I think you misunderstand a little bit the history there. The Medicaid drug rebate program depends on best price to calculate what the Medicaid drug rebate is. And so manufacturers were not trying to claim back money. They were adjusting the best price, because if they continued to give discounts to certain federal grantees, safety net hospitals, it was impacting their Medicaid drug rebate. And so what Congress wanted to do was preserve the ability for manufacturers to continue to give a discounted price. To those safety net hospitals. So that's just the background of how this came about. Can I just ask you? You may very well be right. I read some congressional history that said that in the two years between the Medicaid drug rebate program in 1990 to 1992, when 340B gets put into place, the covered entities that experienced a large increase in prices. And so 340B was to address that unintended consequence. So Your Honor is right. They did experience the increase in price, but it was because manufacturers had to not give them a better price. I understand. You're saying it's for a different reason. But that was the problem that Congress was trying to fix. Yes. I do agree with that. So that brings us then to what Congress sought to do, which was impose certain obligations on manufacturers as essentially the price of admission to participation in Medicaid and Medicare Part B. And it set the price of admission at the 340B program. And so when you're looking at what the field is here, I think you need to look at the sort of practical reality of what the 340B statute does and what Rhode Island statute does. Both of which is to impose regulations on manufacturers. They're not looking at kind of different entities. So unlike some other cases this court has had where the federal law might address one player and the state law addresses another, both of these address manufacturers. And what I think is particularly important, and this goes to your gap question, the reason that there is this perceived gap is because the 340B statute says the manufacturer has to make an offer to sell drugs to covered entities. And it does not impose any conditions on that offer other than what the price term is. So Novartis actually challenged the federal government when the federal government tried to say, actually, there are limitations. There are limitations on what your offer can be. And what the D.C. Circuit said in response to our challenge in a case in which the federal government was the defendant was that we were right, that Congress had expressly preserved the right of manufacturers to set commercially reasonable terms. Well, I thought that what it said was not so much that Congress had expressly preserved, but that Congress had not prohibited it, which are two different things. They are different things, and if you look at the D.C. Circuit decision, it uses the word preserves. And I think that is important because when this court has to address, and I'm going to talk briefly about conflict preemption, but in conflict preemption, what you're trying to figure out is if federal law expressly or implicitly gave a manufacturer a right and whether state law is interfering with that right. What if I disagree with your reading of the D.C. Circuit case? And I just read it to say, Congress just didn't address this, so therefore it's not prohibited, so you Novartis can do it. But because it just didn't address it, then I'm left with my struggle with what was actually preempted, what was the field and what did the field preempt, because Congress just didn't act. And I'll give you extra time.  Congress just didn't tell us what it wanted, and therefore, under the case law, a state can then come in and fill the gap. So, Your Honor, I think there are a couple layers of an answer to that, the first of which is to start with the fact that this is spending clause legislation. And spending clause legislation comes with a whole doctrine that dates back decades and even a century on what it means for it to be spending clause legislation. And what spending clause legislation brings with it is that there has to be fair notice to funding recipients of the full scope of their obligations up front. In the Cummings decision that we cite from the Supreme Court, Cummings specifically talks about what statutory silence means in the spending clause context. And Cummings tells us that statutory silence is not a, quote, license to freely supply additional terms that the court cannot be sure Congress would have chosen. So silence carries this important meaning in spending clause legislation. If I can talk briefly, and I know I'm over on time. Please, because my colleagues need to. I do want to talk briefly about field preemption, because I think the field preemption, first of all, you do have to define the field. We think it is the scope of manufacturer's obligations. And Congress specifically set up a uniform, nationwide enforcement mechanism. We know that from ASTRA that talks about Congress giving the same agency authority over the 340B program and Medicaid so that it can be, quote, home-based. And we know that from ASTRA that Congress gives the same agency authority over the 340B program and Medicaid so that it can be, quote, home-based. So we have that. We have a dominant federal interest in uniform administration, which is consistent with why this court in French found that there was field preemption. And we have a dominant federal interest in setting the terms of the price of admission to Medicaid. I would refer you to the Drummond decision from Oklahoma and also the United States brief in the PhRMA case where it says the federal interest here, quote, could harm Medicaid. So we know that there is a very strong federal interest in how this program works. On conflict preemption, there are several layers of conflict preemption that I think are important here. The first is that this law forbids what federal law allows, the state law. Rhode Island's law forbids what federal law allows. We know from the Novartis case and the Sanofi case that federal law allows us to have a one-contract pharmacy policy, which is the way the program operated for the first several decades. It allows us to request claims data so that we can identify who is getting these drugs and in what circumstances. And the Rhode Island law takes that away. So that's conflict number one. And if I could just to make sort of very concrete why these conflicts matter, imagine that you have an individual who grew up in Portland, Maine, and then she goes to college at Brown in Rhode Island. And now she actually lives in San Francisco because she got a job after college out there, and she gets treated at a covered entity in San Francisco. Through all this third-party administrator backend accounting mechanisms, you have a covered entity in Maine, a covered entity in Rhode Island, and a covered entity in California who all say, that's our patient. We get a 340B discount after the fact retroactively on that patient's prescription. The question becomes, who decides whose patient it is? If you don't have the federal government who can have the broad perspective, which is what ASTRA says, hold the control reins, then you could have a Maine adjudicator decide that it's a patient of the Maine entity, a Rhode Island adjudicator decide it's a patient of the Rhode Island entity, and HRSA decide it's a patient of the California entity. And now you've had conflicting adjudications over the very same prescription. I think that's a concrete way of showing that the reasons Congress set up a uniform nationwide enforcement mechanism are important. Briefly on the claims data, I think the claims data piece, Rhode Island does not defend that their claims data prohibition is not conflict preempted, and we point this out on pages 20 and 21 of our reply brief. I think for purposes of this argument, they have conceded by not addressing it in their brief that their claims data provision is conflict preempted. And the other thing I would note is that the conflict preemption requires looking at the full purpose and effects. What I heard Rhode Island arguing to you earlier today was to look just at one of the purposes of the 340B program, which certainly is to provide a subsidy. But to ignore the other purposes of the program, which are to set this price of admission in a particular way, to deliberately choose, in the words of the D.C. Circuit, to allow manufacturers to impose commercially reasonable terms that make something a bonafide offer, but don't limit the manufacturer's ability to do so. And so for all of those reasons, I'm happy to address other questions. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellees please introduce himself on the record to begin? May it please the Court, James Argon on behalf of the Rhode Island Attorney General and Auditor General. If I may, I'll start with Your Honor's question about what is the relevant field. I think the field, which is why I spent time in the last argument discussing how the Supreme Court has described the program and how Congress has described the 340B program, is entirely controls the analysis of what is field preempted and how the state law fits into the scheme. The defect that I think that runs through all of the plaintiff's arguments is that they rely on congressional silence, as creating an affirmative right to impose conditions that they think are reasonable, to limit the ability of covered entities to participate in the 340B program, and to achieve Congress's objective of subsidizing them as they continue to provide care to low-income and vulnerable communities. And you don't need to look much further than the legislative record that's been submitted, that was submitted and considered by the Rhode Island General Assembly, where they reviewed the very detrimental effect that these manufacturer-imposed policies were having on the ability of covered entities to access the subsidies that Congress intended them to have in exchange for providing care to their patients. And many of the manufacturers actually admit that. Abby Vee, for instance, has put in an affidavit in their record showing that their restrictions have resulted in a 98 percent reduction in the number of subsidies or the reduced pricing made available to covered entities. I wanted just to direct you to respond, if you would, to the argument that silence is different here in the spending clause context, because I can travel with you for much of it in typical context, but here where you have a bargain between the federal government and an entity, what is it that allows the state to fill in any perceived gap in that agreement? I think it's a fundamental concept of federalism that all of the cases under preemption and spending clause have looked at, that it recognizes that in our dual system with state and federal governments, the fact that Congress has spoken on an issue, indeed, as the Supreme Court said in Hillsborough, enacted a comprehensive legislative scheme does not mean that the state cannot come in and address additional needs that it sees are relevant. So you think the spending clause context doesn't matter? Is that what you're arguing to us? Absolutely. I do not think it changes the analysis one bit. The spending clause is just a way the manufacturers are trying to evade the usual presumption against preemption that applies to public health and safety regulations passed under the state traditional police powers, which is exactly what Chapter 288 was designed to do. And let me give you a practical example of that. As I mentioned, what the effect of these manufacturer policies are having, they like to say, well, we'll continue to deliver drugs to any pharmacy in Rhode Island. Patients can pick them up anywhere. That really blinks reality. What they're trying to do is deprive the covered entities of their ability to obtain the subsidy because they will only offer the discount, honor the discount pricing that they promise to provide by participating in the 340B program. If the patient picks it up at the one pharmacy they select, they want to do it. And as the record for the General Assembly showed, many of these patients don't live in an area either near the health care provider or in an area close to a pharmacy, and many of them lack transportation needs. The federal regulators themselves recognize that's why contract pharmacy arrangements were so important. They preserved the ability of the covered entities to realize the subsidies and the savings that the program was intended to confer upon them, and they provided and respected the freedom of access and choice that patients required to obtain the distribution and the dispensing of their medicine. Counsel, everything that you're saying, I understand very well, but I think the question for us is really, how do we know what policy choice Congress made? So your opposing counsel has said two things that would be helpful for you to respond to. She has defined her view of what the field is, which is just the requirements and obligations of 340B participants, as I believe is how she put it. It would be really helpful to understand very succinctly what Rhode Island sees as the field here. And then similarly, following up on Judge Dunlap's spending clause question, she has said for spending clause legislation, the case law supports that people who are opting into the program need to know all the conditions up front, that that's the only way that it's fair and that they just didn't know that it was an unlimited amount of spend here, essentially. So can you respond to those two specific points? Sure. I think the field, it's not just the 340B program. You have to look at what was Congress's intent. And Congress's intent was to use the 340B program, particularly the discount pricing mechanism, to subsidize the cost of services for vulnerable communities and patients. So then what is the field? Is the field just public health? Is the field the public health needs of low income communities? How would you define the field for us? I would define it in terms of those public interests, the public safety standards, which is exactly what Congress was relying on. They wanted to insulate covered entities, which are carrying the lion's share of providing care to these vulnerable communities with the ability to stretch scarce federal resources as far as they could so that they could continue to do that. And the field was not just, you have to offer, you know, they spoke only about pricing, but the field goes beyond that because it's not just the price, it's the subsidy that comes with it. And I think that gets to the second point. There's two levels of relationships here. The 340B program and the federal regulators really always spoke about the PPA, the pharmaceutical pricing agreements, which is between the federal government and the manufacturers, the mechanism by which they opt into the 340B program. But the other relationship, and this is where the Chapter 288 is focused, it's focused on the relationship between the covered entity and pharmaceutical companies with whom they have arrangements to dispense the drugs to their patients. And that's a critical piece. And if we're talking about preemption and conflict, there really is no conflict because, as my sister said, since the beginning of the 340B program, covered entities have relied on contract pharmacy arrangements to enable them not only to participate in the program itself, but also to dispense medications to their patients. And there isn't like a zip code that Congress envisioned where these services would be provided. I mean, some of the pharmaceutical companies have gone so far as to say it only should go into low income areas or areas of certain zip codes. There's no such requirement that any patient who receives care at a covered entity is entitled to have their prescription filled and the covered entity is entitled to use contract pharmacy arrangements to dispense that medication to their patient. And what is more, as I said in the early... The dispensing occurs, right? The dispensing occurs... This is in the replenishment model where the patient has already obtained the medicine. The patient's price doesn't change, regardless of what happens here. And so it's a question at what price ultimately does the pharmacy... What price does the manufacturer have to provide that medicine after everything gets sorted out in the background after the fact? So I'm not sure I follow your argument that this is about delivery if the delivery is happening. It's about delivery in this way because it goes back to the policies where the manufacturers have created a system where they say they will supply the drugs to all pharmacies, but the only way the covered entity realizes the benefit of providing the services to a patient is if they prescribe it to the one pharmacy that the covered entities... that the manufacturers say is the one we'll ship to. It's a ship to provision. And what they brought into this is what Your Honor is referring to is the replenishment model, which is an inventory control model, recognizing that drugs are fungible. Pharmacies stock them. They dispense them to any patient. And then there's a reconciliation process. If I could just wrap up. That distribution model is not required by state law. It's not required by federal law. It's another voluntary choice that the manufacturers have made. And it has nothing to do with the preemption of a state law, which is, in terms of when you focus on getting the drugs to the patients, as the 8th Circuit and other courts have held, the distribution of drugs to patients of medical providers is a classic area of state police powers in public health and safety. It's not changed. Is there anything in the record that suggests that the medicines would not make it to the patients absent this law? The difficulty is not on the patients, per se. I mean, some of them, as I think federal regulators have recognized, some of them may have transportation and other barriers, health related, where it makes it more difficult for them to obtain that medication out of one pharmacy. But they could go to another pharmacy. And I think that was an example that my sister highlighted about people living out of state. Well, I mean, that's true. People travel, but they receive help if they receive health care from a covered entity and they become a patient of the covered entity. The 340B program requires that the covered entity receive the discount pricing. So it comes back to pricing. The medicine is delivered, but ultimately what you're saying is that it gets delivered. But then the question is, how much does the covered entity have to pay for it? It's not how much the covered entity pays for it, because most of these things are paid by insurance companies. But what matters is how much what is the subsidy that the covered entity gets back? Where are the program savings? And your owner mentioned the bargain. Well, this gets to the second tier of the bargain, right? The relationship between covered entities and contract pharmacies. That bargain is governed by state law. And all the federal regulators have recognized that that's an ordinary contract principle. If the covered entity supplies the drugs and the pharmacy dispenses, if the covered entity prescribes the drugs and the covered entity dispenses the drug, the covered entity is supposed to be subsidized for providing that care. And this is where the public health policy comes in, because if they don't get those subsidies, they're not going to be able to continue to do this. And that's the legislative record that the Governor of Rhode Island, suffering dramatic losses of subsidies received from the program, which affected their fundamental ability to continue providing care. So what I'm struggling with with that argument, and I don't discount the possible policy ramifications, but it seems to me that there are potentially countervailing considerations that we're not particularly well-suited to decide, including, well, what effect does the state's imposition of this requirement have on other programs such as Medicaid? And so it really comes back to a who-decides question. Do the states get to decide this significant policy question, which I hear you, or is it the federal government that gets to decide? And one concern I think that at least your opponents seem to be arguing is that this could upset other apple carts in the pursuit of an interest that the state is interested in. So doesn't that further the argument that there are preemption concerns here, that Congress ultimately left room for the manufacturers to impose some limitations, and if there are ramifications from that, Congress needs to deal with it? Respectfully, Your Honor, yes to the last part, no to the first part. No to the part that I don't think it changes anything in terms of what Congress intended. If you recall, the contract pharmacies have been an integral part of the 340B program since its beginning 30 years ago. They've always had a role. Federal regulators have always recognized that there are critical players in this because without them, the covered entities could not participate in the program and patients would not have access to the medicines. They expanded it from single pharmacy, contract pharmacy arrangements to multiple pharmacy arrangements. But the multiple pharmacy arrangements started in 2010 and were in effect to 2020, 10 years where there was no problem with this. Certainly the Congress was well aware that these contract pharmacy arrangements were in place. It was going on for 10 years. And it's only now after the pandemic that some manufacturers, not all, but some have started to impose these restrictions on delivery of drugs to covered entities based on either contract pharmacy arrangements or the pre-audit requirement of providing confidential claims data information, which maybe we'll have a chance to discuss later. But all those things, that goes to, I think, also on the preemption issue. These laws, the pharmaceutical companies always say that the state is targeting them. Oh, thank you. The state is targeting them. But the reality is from the record of how this program has evolved, it is the pharmaceutical manufacturers who changed the process. They are the ones who imposed restrictions on covered entities because they were using contract pharmacy arrangements. That didn't exist until recently, just starting in around 2020. And the state legislature responded to that societal concern by enacting Chapter 288 so they would not discriminate against Rhode Island covered entities. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce herself. She has a two-minute rebuttal. Thank you, Your Honors. Jessica Ellsworth on behalf of Novartis. I'd like to make three points in my rebuttal. The first is I heard counsel for Rhode Island describe this law as an exercise of traditional police power. That is wrong for at least four reasons. The first is that there is no history of any regulation by Rhode Island or any other state of the 340B obligations that manufacturers have for participating in that program. Second, there is absolutely a history of federal presence. This is a program that the federal government created to solve a particular problem with particular requirements. Third, this is not a law of general applicability. Novartis is not making any argument that it is immune from having to comply with laws of general applicability. This is a specific law that targets participants in the 340B program. And finally, the Supreme Court made clear in the Buckman case that the presumption against preemption does not apply to a state law that depends on a federal statute. This state law depends on a federal statute from start to finish, certainly in the provisions that we have challenged here. It is a parasitic additional requirement on those. Second, on field preemption, I want to come back, Judge Rickleman, to your question about how to define the law and what to look for. I think the Arizona decision is a very useful one from the Supreme Court because there the court defined the field as alien registration because that is what both the federal law and the state law regulated. It didn't look at immigration or some broader or more abstract context. It looked at what was it that these laws were regulating. Finally, I want to talk briefly about conflict preemption to make one point. We quote on page 19 of our brief the statement from the D.C. Circuit Novartis decision in which we had challenged our right, our federal law right, to have commercially reasonable restrictions. And what the D.C. Circuit said was that Congress's silence, quote, preserves rather than abrogates the ability of sellers to impose at least some delivery conditions. That's consistent with what Sanofi said, that federal law does not, quote, require delivery of discounted drugs to an unlimited number of contract pharmacies. When you look at this court's holding in the Maine Forest Products Council case, which is, I think, the key case because it is the only other state law I'm aware of that attempts to override a congressional program there. It's the H-2A visa program. The way the court thought about it was to ask whether the federally enacted program conferred a right on manufacturers that conflicted with Maine's rights. Excuse me. In that case, it was with Maine. Here it's with Rhode Island. And so we have a special notice that we filed with this court showing that HRSA has signed off on our contract pharmacy and claims data policy as not improper under federal law, something that we have the right to do. At a minimum, there is an implicit right when we have our regulator telling us that we can do this, such that conflict preemption applies. Can I just go back to the field preemption point and then my colleagues, whatever questions they may have? So I just, again, you cited Arizona and it struck me that in that case, the field was defined fairly narrowly. So when you answered my earlier question about what you think the field is, you think the field is all the sort of obligations for manufacturer participation in the 340B program, as I understood your answer. So just to go back and ask what's troubling me a slightly different way. I think there's when I look at the text of the statute, I just see a narrower field. As I said, it was a response to a price problem. So they set the price. And then the other thing that the statute does is it says to make sure that there's no fraud and manufacturers have recourse if they have reasonable cause to believe there is. We have these no diversion and no double discounting and ADR process. And we have to look at congressional intent, not what HRSA says today, which has obviously changed over the years. And so, again, I just want to ask you what in the text of the statute says that Congress had more intended to do more, intended to have a broader field than to just say, we're going to set the price and deal with this particular problem that arose in the last two years. And then we're going to put in place some guardrails to make sure that there aren't abuses. And that's it. So it's not all obligations for participating in the program, which is how you've defined it. It's narrower. It's the equivalent of alien registration, not all of immigration, just as you just said. So what concretely in the statute do you think supports your interpretation instead of mine? I think it is the same part of the statute that you are talking about that talks about the price. But that price has to be contained in an offer. It's the offer language. It is the offer language. And that is why the D.C. Circuit said it has to be a bona fide offer. And Your Honor, I heard Rhode Island say there have been contract pharmacies in this from the very beginning. That's actually not true. They came in sort of a few years into the program when it became apparent that some covered entities didn't have an in-house pharmacy. And so you couldn't make an offer to them. Well, can I ask you a question about that? Because obviously covered entities existed before 340B was put into place. And wasn't it a known background fact? You can disagree with me, but that most of them did not have covered most of the covered entities did not have in-house pharmacies. I thought that was a known background fact at the time the Congress legislated. So, Your Honor, I think to answer that question, the covered entities today is a different list from the original statute. They were mostly federal grantees when the statute was first enacted and then it got expanded to a broader group in 2010. I'm not aware of sort of concerns that existed about contract pharmacies being necessary. And certainly for the first 20 years of the program, there was never more than one contract pharmacy and the program existed. So it's your understanding that as of 1992, when Congress legislated, there weren't contract pharmacies being used by covered entities because it was a narrow group? I think it is that there were not contract pharmacies who were covered entities were not asking for the 340B price on sales that were being drugs that were being distributed through contract pharmacies. They came in later and then HRSA did a or HHS did a pilot program. There were sort of several steps in the process. Do you know? And it's fine if you don't. But you just know. Do you know off the top of your head what roughly what percentage of covered entities, which I understand is a smaller list than than it is now, would have been using contract pharmacies in 1992? I do not know the answer to that. I do know that there was a bill that was considered at that time that would have included contract pharmacies and Congress chose not to enact that version. So read what you want into Congress's decision not to do that. But the program existed without multiple contract pharmacies for several decades. And we now have a definitive interpretation in a decision in which the agency was a party in which the courts have determined that manufacturers do have a right to impose commercially reasonable limits on their offers. Thank you. Thank you, Your Honor. Thank you. That concludes argument in this case.